## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| George Petrides,<br><br>    Plaintiff,<br><br>v.<br><br>National Hellenic Museum,<br><br>    Defendant. | **COMPLAINT**<br><br>**Case No. 26-cv-3294** |

George Petrides ("**Plaintiff**" or "**Petrides**"), by and through his undersigned counsel, brings the present action against the National Hellenic Museum ("**Defendant**" or "**NHM**"), and alleges as follows:

### INTRODUCTION

1. Plaintiff is a world-renowned sculptor with sculptures installed in public spaces in more than half a dozen countries.

2. Plaintiff created a traveling exhibition titled Hellenic Heads: A Personal Exploration of Greek History and Culture (the "**Exhibition**"), a multimedia exhibition designed to travel to ten (10) venues over a five-year period across the U.S., Europe, and Asia.

3. The Exhibition was first shown in May 2022 at the Embassy of Greece in Washington, D.C., and it generated great critical acclaim and public interest.

4. The Exhibition has been seen by over 100,000 people since May 2022 and is currently installed at its eighth venue in Paris, France.

5. As a result of the success of the Exhibition at its first venue, Plaintiff was approached by NHM to display the Exhibition at its facility in Chicago, Illinois.

1

6. Defendant used the fame and public appreciation of the Exhibition to generate ticket sales, entice people to rent event space, and solicit donations for Defendant.

7. While in Defendant's custody, the sculptures of the Exhibition were subjected to repeated physical handling without professional art-handling protocols and suffered varying levels of damage and destruction.

8. This is an action to compel Defendant to address the unlawful damage and destruction it caused or allowed to be caused to the sculptures of the Exhibition while they were in Defendant's care and custody.

<strong>JURISDICTION AND VENUE</strong>

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 in that this action arises under federal law. *See* 17 U.S.C. §106A, *et seq*. This Court has supplemental jurisdiction over Plaintiff's common law claims under 28 U.S.C. §1367, as they are related to the federal claim and form part of the same case or controversy.

10. This Court has personal jurisdiction over Defendant because it is located and conducts operations within Chicago, Illinois.

11. Venue is proper in this district pursuant to 28 U.S.C. §1391(b), as Defendant resides in this district and a substantial part of the events giving rise to the claims occurred here.

<strong>PARTIES</strong>

12. Plaintiff resides in New York City, New York, and is a professional artist with a focus on public sculpture. Plaintiff is the "author of a work of visual art" within the meaning of 17 U.S.C. §106A.

13. Defendant operates a facility located at 333 South Halsted Street, Chicago, IL 60661, with a stated mission to promote Greek history, art, and culture.

2

## FACTUAL ALLEGATIONS AND BACKGROUND

### *Plaintiff's Works*

14. Plaintiff is a contemporary sculptor who focuses on the intersection of personal narrative and cultural heritage through self-developed creative processes combining ancient methods and current technology.

15. Plaintiff has over thirty (30) permanent public installations across seven (7) countries. Institutional categories include corporate, education, government, healthcare, museum, and religious institutions. Among many standout examples, a sculpture was selected by the White House for display and addition to a presidential library, and other sculptures have been installed at the Mission of Greece to the United Nations and in the Ecumenical Patriarchate of the Greek Church in Istanbul, Turkey. Large-scale monumental sculptures stand outside leading universities and hospitals around the world.

16. The Exhibition presents Greek history and culture through six monumental portrait heads, with each representing a distinct era—from Ancient Greece and the Byzantine Empire to more recent periods such as the Asia Minor Catastrophe, the 1940s Nazi Occupation, and concluding with modern Greece. Each head is modeled on one of the Plaintiff's family members, while referring to sculptural precedents by past masters such as Michelangelo. The creative process is unique and of Plaintiff's invention: it joins ancient methods with current technologies and materials. The Exhibition is a complete multimedia exhibition: in addition to the sculptures, it includes extensive videos (presenting Greek history, Plaintiff's creative process, and guided tours in multiple languages), informational placards, a dedicated website, and a printed exhibition catalog. Major institutions lent material for inclusion in the Exhibition, for example, the Jewish Museum of Greece lent archival photographs of Greek Jewry before and during the Nazi occupation.

17.     In parallel with exhibiting his artwork, Plaintiff offers his artwork for purchase. For example, two oversize heads comparable to those in the Exhibition were sold for $95,000 and $100,000 each.

18.     Plaintiff's Exhibition has been the subject of extensive press coverage in over thirty (30) published articles, is known in the public marketplace, and has been exhibited broadly within the United States and abroad. As such, the Exhibition is considered a work of recognized stature. *See* **Exhibit 1**, collecting a sample of press coverage regarding the Exhibition.

### *Defendant's Lack of Accreditation and Stewardship Standards*

19.     The American Alliance of Museums ("**AAM**") is the preeminent accreditation organization for museums in the United States and has been recognized as the gold standard of museum excellence for over fifty years. AAM accreditation requires a member institution to demonstrate that it meets professional standards regarding collections stewardship, including: documented handling protocols, condition reporting and movement tracking, environmental monitoring for UV light, temperature, and humidity, appropriate staffing for events near collections, and written policies for the care of loaned works.

20.     Despite promoting the title "Museum" in its name and accepting custody of high-value works of art, such as those in the Exhibition, Defendant is not accredited by AAM On information and belief, Defendant also has not obtained AAM's Core Documents Verification, has not participated in the AAM Collections Assessment for Preservation program, and does not meet the AAM's collections stewardship criteria.

***Defendant's Exhibition of Plaintiff's Works***

21. Following its initial success in Washington, D.C., the Exhibition came to the attention of Defendant, which proposed presenting it at its facility in Chicago's Greektown neighborhood.

22. On February 28, 2023, Plaintiff and Defendant entered into an exhibition agreement (the "**Exhibition Agreement**"). The Exhibition Agreement is attached as **Exhibit 2**.

23. It is common in the art world for venues participating in a traveling exhibition to pay the organizer an "exhibition rental fee" or "participation fee." The reason for this is that the organizer typically incurs substantial expenses to create the exhibition and its collateral material, from which the venue benefits without doing the work or incurring the expense of creating a comparable exhibition itself.

24. Exhibition fees can vary, from as little as a few thousand dollars to over $250,000. For an exhibition similar to the Exhibition, fees would typically range from $17,000 to $60,000 for a three-month rental. Notably, the rental period in this case is eight months.

25. However, Defendant did not pay an exhibition fee to Plaintiff, despite Plaintiff providing a fully-curated exhibition with signage, pedestals, multiple videos to play about the works, a dedicated website, and catalogs that Defendant could sell for $60 each.

26. The Exhibition Agreement specified the exhibition of six (6) of Plaintiff's works, each insured at a value of $75,000. *See* Exhibit 1, Annex A. This value represented an agreed-upon minimum for insurance purposes. Five (5) of these works are at issue here: Archon, Heroines of 1821, the Refugee, Man of Two Wars, and Kore (individually referenced by title and collectively referenced as the "**Works**").

27. Per the Exhibition Agreement, Defendant was obligated to "exercise the same care with respect to the Works as it does in the safekeeping of its own collections including security, cleaning, and maintain gallery space, and regular monitoring of gallery conditions such as temperature, humidity, and light exposure." *See* Exhibit 2, Section 3.4.

28. Per the Exhibition Agreement, Defendant was to provide an initial condition report and photographs and share such materials with Plaintiff immediately upon arrival of the Works. *See* Exhibit 2, Section 3.6.

29. Per the Exhibition Agreement, "[t]he Museum's insurance coverage will only be in effect for the period of time that the Works are on the property of the Museum or under the Museum's possession and control." *See* Exhibit 2, Section 3.5.

30. Moreover, per the Exhibition Agreement, "[a]ny decisions regarding the appearance of the exhibition, the placement of the Works in the exhibition, or the manner in which the exhibition is presented shall be made by the Museum in consultation with the Traveling Exhibition Manager." *See* Exhibit 2, Section 3.9. Plaintiff understood "Traveling Exhibition Manager" to be Eleftheria Gkoufa when entering into the Exhibition Agreement (the "**Traveling Exhibition Manager**").

31. Defendant failed to provide Plaintiff with the initial condition report and photographs upon taking possession of the Works.

32. Due to the great success of the Exhibition at Defendant's facility, including financial and reputational aspects such as global exposure, Defendant requested three successive extensions of the original exhibition period, bringing the total exhibition period to approximately eight months.

33. Defendant displayed the Works in its most prominent gallery: a first-floor location known as Calamos Great Hall.

34. On information and belief, since accepting custody of the Works, Defendant hosted multiple events in Calamos Great Hall, where hundreds of guests, staff, and independent contractors congregated for large events like weddings, corporate events, and galas.

35. Defendant charges a fee to host events in Calamos Great Hall, ranging from $2,000 to $15,000, depending on the event.

36. On information and belief, in order to accommodate the commercial events it hosted in Calamos Great Hall, Defendant repeatedly and physically handled, lifted, and relocated the Works when events were held in Calamos Great Hall, without reasonable or necessary protective measures required to prevent damage to the Works.

37. On information and belief, Defendant did not adequately staff the events it hosted in the Calamos Great Hall in order to prevent damage and destruction to the Works by visitors and event staff, thereby allowing the Works to be damaged by Defendant's guests, employees, and independent contractors it invited into its facility.

38. On information and belief, Defendant's repeated physical handling, lifting, and relocation of the Works—without any or sufficient conservator oversight, without custom crating, and without the protective measures required for mixed media sculpture of this fragility—caused incremental chipping, spalling, abrasion, and edge loss.

39. Mixed media sculptures, such as the Works, are fragile and thus must be handled with care in order not to cause damage. Such a level of care required for the Works is demonstrated within the report completed by the Conservation Center (the "**TCC Report**"), attached as **Exhibit**

**3**, which recommends that the Works be "transported in a custom crate with foam padding and protective wrap." *See* Exhibit 3, p. 4, 13, 19, 30, and 39.

40.　　On information and belief, Defendant regularly and unilaterally reconfigured the exhibition layout for commercial events without consulting the Traveling Exhibition Manager. Such reconfiguration is demonstrated in Defendant's advertisement for the Calamos Great Hall as a commercial event venue. *See* **Exhibit 4**, a copy of a June 7, 2024 Facebook post captioned "HOST YOUR EVENT AT THE NATIONAL HELLENIC MUSEUM," showing four (4) of the Works moved to accommodate event furniture.

41.　　Defendant's repeated movement and handling of the Works without proper care and failure to adequately safeguard the Works, both when they were on display and when they were being moved at Defendant's facility, resulted in cumulative damage and destruction to the Works. The Works were displayed in Calamos Great Hall, which features floor-to-ceiling windows with adjustable blinds. On information and belief, the window blinds were not lowered at appropriate times to protect the Works from direct sunlight.

42.　　When taking custody of artwork, institutions like Defendant are expected to review the art and produce a report regarding the condition of the art at the time it was received, which includes photos and written comments.

43.　　Likewise, when artwork leaves the custody of institutions like Defendant, they are expected to review the art again and produce a report regarding the condition of the art at the time it leaves the institution's custody.

44.　　Here, Defendant claims to have created condition reports (the "**Condition Reports**"), attached as **Exhibit 5**, which combine its alleged assessment of the Works at the time

8

it accepted them into its custody and the time when the exhibition ended, with any changes purportedly identified by highlighting.

45. The Condition Reports identify damage and destruction suffered by the Works that goes beyond any ordinary wear that might occur over time and represent an admission by Defendant that the Works were damaged while in its custody and care.

46. The Condition Reports fail to identify all damage and destruction caused to the Works while in Defendant's custody.

47. As a result of combining the intake and outtake assessments into a single document, without providing copies of the intake assessment separately from the outtake assessment, the Condition Reports fail to meet accepted standards in the art community and fail to correctly identify damage incurred to the Works while in its custody.

48. On March 24, 2024, Defendant concluded the Exhibition.

49. On March 25, 2024, Defendant purportedly completed the Condition Reports for the departure of the Works by adding comments to the same Condition Reports it created when it accepted custody of the Works.

50. On March 27, 2024, Plaintiff received notice that the Works were damaged while in Defendant's custody and care via copies of the Condition Report. However, Plaintiff did not receive any images of the Works taken during the initial intake, which would have allowed Plaintiff to better understand the true extent of the damage done to the Works.

51. Prior to receiving the March 27, 2024 notice, Plaintiff had no reason to suspect that the Works were being damaged.

52. Prior to receiving the March 27, 2024 notice, Plaintiff was not aware of the damage Defendant caused to the Works.

9

53. Upon learning of the damage to the Works, Plaintiff wrote to Defendant, informing it of the damage done to the Works while they were in Defendant's custody and care.

54. The damage done to the Works goes far beyond any natural wear and tear that would occur if the Works had been properly maintained.

55. While the damage done to the Works varies by piece, each of the Works suffered extraordinary damage while in Defendant's custody.

56. On April 12, 2024, counsel for Plaintiff wrote to Defendant, requesting that the Works not be moved and put Defendant on notice that movement of the Works was causing damage. *See* Apr. 12, 2024 Letter from Pl. to Def., attached hereto as **Exhibit 6**.

57. On July 9, 2024, counsel for Plaintiff again reiterated Plaintiff's demand that the Works not be moved in order to prevent even further damage to the Works. *See* Jul. 9, 29024 Letter from Pl.'s Att'y to Def.'s Att'y, attached hereto as **Exhibit 7**.

58. On or about March 2025 through May 2025, Defendant verbally refused Plaintiff direct photography access to the Works. As a result, Plaintiff was compelled to use a third-party photographer as a paying patron in order to receive contemporary photos of the condition of the Works.

59. On August 12, 2025, Plaintiff once again notified Defendant's counsel that movement of the Works was causing damage and that the pieces not be moved or touched further and requested that Defendant prevent excessive exposure to sunlight and other environmental factors.

60. Plaintiff finally received copies of the initial intake photos on March 30, 2026— nearly three years after the photos were taken. The intake photos, when finally received, showed each of the Works in sound condition at the commencement of Defendant's custody.

61. Despite three demands by Plaintiff that the Works not be moved, the damaged Works continued to be displayed and moved during events held within the Calamos Great Hall, and Defendant continued to move the Works around its facility to accommodate use of the Calamos Great Hall as a venue.

62. As a result of Defendant's refusal to accept responsibility for the damage done to the Works, and the fact that insurance coverage for the Works does not exist outside of Defendant's premises, Defendant has retained possession of the Works.

63. The damaged Works were displayed under Plaintiff's name and signage to guests, paying visitors, journalists, institutional representatives, prospective donors, and members of the Greek American community, who attributed the damaged Works to Plaintiff's craftsmanship and fabrication process.

64. On information and belief, Defendant continued to market the Works on display at its facility after they were damaged through ticket sales, advertisements, and social media posts. *See* Sample of Social Media Posts, attached hereto as **Exhibit 8**.

65. To date, Defendant retains possession of the Works and continues to exhibit the Works.

66. Defendant continues to derive financial and intangible benefit from the Works, despite termination of the Exhibition Agreement two years ago.

## COUNT I
### Violation of the Visual Artists Rights Act
### (17 U.S.C. §106A(a)(3)(A))

67. Plaintiff realleges and incorporates by reference the foregoing allegations as though fully set forth in this paragraph.

68.    Plaintiff's claim arises under 17 U.S.C. §106A(a)(3)(A) for the violation of his right of integrity due to the intentional distortion, mutilation, and/or modification of the Works as defined in 17 U.S.C. §101.

69.    Plaintiff created and maintained all ownership and copyright interest in the Works, which are works of art subject to the protection of VARA.

70.    Plaintiff incurred significant financial loss in the value of the Works as a result of Defendant's distortion, mutilation, or modification of the Works.

71.    Defendant's actions as alleged herein were willful within the meaning of 17 U.S.C. §504(c)(2) as Defendant was notified in writing that its handling of the Works was causing damage, and it continued on that same course of conduct despite escalating written notice over a period of two years.

72.    Plaintiff is entitled to recover all damages available for Defendant's violations of VARA, including attorneys' fees, together with such other relief as the Court deems just and proper.

**COUNT II**
**Violation of the Visual Artists Rights Act**
**(17 U.S.C. §106A(a)(3)(B))**

73.    Plaintiff realleges and incorporates by reference the foregoing allegations as though fully set forth in this paragraph.

74.    Plaintiff's claim arises under 17 U.S.C. §106A(a)(3)(B) for the violation of his right of integrity due to the intentional or grossly negligent destruction of the Works as defined in 17 U.S.C. §101.

75.    Plaintiff is an artist of recognized stature and requisite professional standing within the meaning of VARA, and he is therefore entitled to the statute's protection.

76. Plaintiff's art, including the Works, is known in the public marketplace and has been exhibited broadly within the United States and abroad. As such, Plaintiff has achieved name recognition among the public and the artistic community, and each of the Works is individually considered a work of recognized stature.

77. Plaintiff created and maintained all ownership and copyright interest in the Works, which are works of art subject to the protection of VARA.

78. Plaintiff incurred significant financial loss in the value of the Works as a result of Defendant's destruction of the Works.

79. Defendant's actions as alleged herein were intentional or grossly negligent as it did not take proper care in respect to the exhibition and movement of the Works, demonstrating disregard for Plaintiff's rights and property.

80. Defendant's actions as alleged herein were willful within the meaning of 17 U.S.C. §504(c)(2) as Defendant was notified in writing that its handling of the Works was causing damage, and it continued on that same course of conduct despite escalating written notice over a period of two years.

81. Plaintiff is entitled to recover all damages available for Defendant's violations of VARA, including attorneys' fees, together with such other relief as the Court deems just and proper.

13

## COUNT III
### Violation of the Visual Artists Rights Act
### (17 U.S.C. §106A(a)(2))

82.     Plaintiff realleges and incorporates by reference the foregoing allegations as though fully set forth in this paragraph.

83.     Plaintiff's claim arises under 17 U.S.C. §106A(a)(2) for the violation of his right of attribution due to the distortion, mutilation, and/or modification of the Works as defined in 17 U.S.C. §101.

84.     Plaintiff created and maintained all ownership and copyright interest in the Works, which are works of art subject to the protection of VARA.

85.     Plaintiff has a reputation for producing exhibition-quality works.

86.     Defendant's actions resulted in damage to the Works as defined in 17 U.S.C. §101, which Defendant's guests, visitors, staff, and other viewers of the Works attributed to Plaintiff.

87.     Defendant's actions as alleged herein caused damage to Plaintiff's honor and reputation for producing exhibition-quality artwork and touring exhibitions.

88.     The damage to Plaintiff's reputation was continuous and occurred every day that the damaged Works were on display.

89.     Plaintiff is entitled to recover all damages available for Defendant's violations of VARA, including attorneys' fees, together with such other relief as the Court deems just and proper.

## COUNT IV
### Unjust Enrichment

90.     Plaintiff realleges and incorporates by reference Paragraphs 48 through 66 as though fully set forth in this paragraph.

14

91. After the Exhibition ended on March 24, 2024, and the Exhibition Agreement terminated, Defendant continued to retain and exhibit the Works and continued to receive financial and intangible benefits derived from the Works.

92. Such benefits include revenue associated with ticket sales, events, and the sale of exhibition catalogs, as well as intangible goodwill arising from Defendant's custody and display of renowned works of art, which Defendant leveraged for donations and other fundraising efforts.

93. Defendant's retention of these benefits without compensating Plaintiff is unjust.

94. Plaintiff lacks an adequate remedy at law for the value of the benefits Defendant retained after termination of the Exhibition Agreement to the extent Defendant's continued retention and exhibition of the Works falls outside the parties' enforceable contractual allocation of rights and obligations.

95. Plaintiff is entitled to restitution in an amount equal to the value of the benefits unjustly retained by Defendant, including the reasonable value of the continued use and exhibition of the Works and any related revenues attributable to that use.

96. Plaintiff seeks such other and further relief as the Court deems just and equitable.

## COUNT V
### Conversion

97. Plaintiff realleges and incorporates by reference the foregoing allegations as though fully set forth in this paragraph.

98. Plaintiff was and remains the owner of the Works, with an absolute right to their possession.

99. The Exhibition Agreement provides that Defendant's insurance "will only be in effect for the period of time that the Works are on the property of the Museum or under the Museum's possession and control." *See* Exhibit 2, Section 3.5.

100. Plaintiff has been unable to retrieve the Works because insurance coverage for the Works does not exist outside of Defendant's premises.

101. By continuing to retain and exhibit the Works after termination of the Exhibition Agreement, and by maintaining possession and control under circumstances that materially constrained Plaintiff's ability to retrieve and exercise dominion over his property, Defendant intentionally exercised dominion and control over the Works in a manner inconsistent with Plaintiff's ownership and possessory rights.

102. As a direct and proximate result of Defendant's conversion, Plaintiff has been damaged, including by loss of control and use of the Works, by the costs associated with the replacement of the Works for other exhibitions, and other losses alleged to have resulted from Defendant's custody and handling of the Works.

### COUNT VI
**Breach of Exhibition Agreement**

103. Plaintiff realleges and incorporates by reference the foregoing allegations as though fully set forth in this paragraph.

104. Plaintiff and Defendant entered into a written Exhibition Agreement governing Defendant's receipt, custody, display, handling, monitoring, and return of Plaintiff's Works for a museum exhibition. *See* Exhibit 2.

105. Plaintiff performed all conditions required of him under the Exhibition Agreement, including delivering the Works and all collateral materials in the Exhibition.

106. The Exhibition Agreement required Defendant to safeguard the Works using the same level of care Defendant uses for its own collection, including appropriate security, cleaning, maintenance of gallery space, and regular monitoring of environmental conditions.

107.     The Exhibition Agreement required Defendant to create a condition report of the Works upon arrival and share such report immediately with Plaintiff.

108.     The Exhibition Agreement further required Defendant to follow Plaintiff's instructions regarding inspection, handling, installation, and protection of the Works, and provided that Defendant would be responsible for loss or damage to the Works where such loss or damage resulted from Defendant's gross negligence and/or failure to follow Plaintiff's instructions.

109.     Defendant breached the Exhibition Agreement by failing to exercise the required level of care with respect to the Works.

110.     Defendant further breached the Exhibition Agreement by failing to follow Plaintiff's instructions for the inspection, handling, installation, and protection of the Works.

111.     Defendant further breached the Exhibition Agreement by failing to provide the initial condition report when it accepted custody of the Works.

112.     Defendant further breached the Exhibition Agreement by unilaterally reconfiguring the exhibition layout for commercial events without consulting the Traveling Exhibition Manager.

113.     Defendant's acts and omissions regarding its treatment of the Works constitute gross negligence within the meaning of the Exhibition Agreement.

114.     While the Works were in Defendant's exclusive custody and control, the Works sustained material damage, including physical deterioration and surface damage, beyond any condition noted at intake.

115.     Defendant's acts and omissions regarding its treatment of the Works also constitute willful and wanton negligence. Having been placed on actual notice that its handling practices were causing cumulative damage to the Works and having been specifically instructed to cease

movement and take protective measures, Defendant ignored each notice and continued its harmful course of conduct.

116. As a direct and proximate result of Defendant's breaches of the Exhibition Agreement, Plaintiff suffered damages, including but not limited to costs of conservation and repair, costs associated with the replacement of the Works for other exhibitions, diminution of value, loss of marketability, harm to his reputation, and other compensatory damages.

117. Plaintiff is entitled to recover all damages available for Defendant's breach of contract, together with such other relief as the Court deems just and proper.

## COUNT VII
### Negligence / Gross Negligence / Willful & Wanton Negligence
### (In the Alternative to Count VI)

118. Plaintiff realleges and incorporates by reference Paragraphs 1 through 102 as though fully set forth in this paragraph.

119. Defendant owed Plaintiff a duty to exercise reasonable care in the receipt, custody, handling, storage, display, monitoring, and return of the Works while the Works were in Defendant's possession and control.

120. Defendant breached its duty to the Plaintiff by one or more of the following actions, each of which constitutes negligence, gross negligence, and willful and wanton negligence.

121. Defendant breached its duty of care by failing to implement and maintain reasonable safeguards and handling practices necessary to prevent damage to high-value artworks entrusted to it.

122. Defendant further breached its duty of care by allowing the Works to be moved, handled, and/or exposed to conditions that foreseeably caused damage during the exhibition period and Defendant's event sponsorship activities.

18

123. Defendant breached its duty of care by continuing its handling and environmental practices, despite being put on notice through several letters over two years that such conduct was causing cumulative damage to the Works. Defendant intentionally continued the identical course of conduct in conscious disregard of Plaintiff's rights and property.

124. As a direct and proximate result of Defendant's negligence, gross negligence, and willful and wanton negligence, the Works sustained significant damage, including physical deterioration and damage.

125. Plaintiff suffered damages as a result of Defendant's negligence, gross negligence, and willful and wanton negligence, including but not limited to costs of conservation and repair, costs associated with the replacement of the Works for other exhibitions, diminution of value, loss of marketability, harm to his reputation, and other consequential damages.

126. Defendant's conduct demonstrated a conscious disregard for the safety and preservation of the Works, entitling Plaintiff to an award of punitive damages to the extent permitted.

127. Plaintiff is entitled to recover all damages available for Defendant's negligence, gross negligence, and willful and wanton negligence, together with such other relief as the Court deems just and proper.

## JURY DEMAND

128. Plaintiff hereby demands a trial by jury on all claims and issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendant as follows:

A. Enter a judgment finding that Defendant's conduct violated VARA;

B. Order an award to Plaintiff for statutory damages in violation of VARA as set forth in 17 U.S.C. §504;

C. Order an award of costs and reasonable attorney's fees incurred by Plaintiff in connection with this action pursuant to 17 U.S.C. §505;

D. Order an award, in an amount to be proven at trial, the measure of the benefits Defendant retained from continued possession and exhibition of the Works after termination of the Exhibition Agreement;

E. Order an accounting of revenues and other benefits Defendant derived for the continued retention and exhibition of the Works after termination of the Exhibition Agreement, to the extent such information is within Defendant's possession, custody, or control;

F. Order an award, in an amount to be proven at trial, including costs of conservation and repair, for the costs associated with the replacement of the Works for other exhibitions, diminution of value, loss of marketability, harm to his reputation, and other compensatory damages, caused by Defendant's breach of contract;

G. Order an award, in an amount to be proven at trial, for damages resulting from conversion, including loss of use, diminution, and other compensatory damages;

H. Order an award, in an amount to be proven at trial, including costs of conservation and repair, costs associated with the replacement of the Works for other exhibitions, diminution of value, loss of marketability, harm to his reputation, and other compensatory damages, caused by Defendant's negligence, gross negligence, and willful and wanton negligence; and

20

I.      Grant Plaintiff such other, further, and additional relief as this Court deems proper and just.

DATED this 25th day of March, 2026.

By: /s/ Jason B. Elster

Jason B. Elster
**ELSTER & MCGRADY LLC**
3847 N. Lincoln Avenue
Second Floor
Chicago, IL 60613
Attorney No.: 6289434
Telephone: (312) 515-5565
E-Mail: jason@elstermcgrady.com
         docket@elstermcgrady.com

*Attorneys for Plaintiff George Petrides*